ORIGINAL

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

KEVIN BURNS )
)
)
PLAINTIFF, )   PLAINTIFF'S COMPLAINT FOR:
)
)
vs. )
)   (1) QUIET TITLE
JPMORGAN CHASE BANK; N.A; )
)   (2) LACK OF PROPRIETY ;
SUCCESSOR BY MERGER TO CHASE )
)   (3) VIOLATIONS OF TEXAS
HOME FINANCE LLC; )
)       FINANCE CODES
)
)   (4) VIOLATIONS OF TEXAS
)
)       PROPERTY CODES AND;
DEFENDANT. )
)   (5) DECLARATORY RELIEF
)
)
)
)
)
)
)
)
)
)
)   JURY DEMAND
)
)
)
)   CAUSE NUMBER 3:13-CV-0993-L-BH
)
)

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

MAY - 2 2014

CLERK, U.S. DISTRICT COURT
By _____
Deputy

**PLAINTIFF'S FIRST VERIFIED AMENDED COMPLAINT**

Plaintiff's First Verified Amended Complaint

Page 1 of 11

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, Kevin Burns (Plaintiff) and makes this, First Verified Amended Complaint, and in support of same would respectfully show the Court as follows:

## I.   PARTIES, JURISDICTION, AND VENUE

1. Plaintiff, Kevin Burns is a resident of Dallas County, Texas.

2. Defendant, JP Morgan Chase N A, successor by merger to Chase Home Finance, LLC hereinafter ("JPMC" ) is a global investment and commercial bank transacting business in Texas as Mortgagee and Servicer who may be served with process by serving its legal department at its registered office, 3415 Vision Drive, Columbus, OH 43219. Service of JPMC as described above can be effected by certified mail with return receipt requested.

3. Defendant, Mortgage Electronic Registration Systems, Inc. ("MERS") is a is a separate corporation that is acting solely as a nominee for Lender and Lenders successors and assigns, with its principal place of business in Reston, Va. and at all times relevant herein was doing business in the state of Texas who may be served with process by serving its legal department at its registered office 1901 E. Voorhees Street Suite C, Danville, IL 61834. "MERS" as described above can be effected by certified mail with return receipt requested.

## II. DISCOVERY CONTROL PLAN LEVEL

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Request for Admission pursuant to Rule 36 of the Federal Civil Procedure and Motion to define Parties involved in above referenced case. Plaintiff intends to conduct discovery in this case.

## III. JURISDICTION

4. The subject matter in controversy is within the jurisdiction limits of this Court. The federal court system has exclusive jurisdiction regarding securities and banking regulations-the body of law protecting the public by regulating the registration, offering, and trading of securities and the regulation of banking practices.

5. This Court has personal jurisdiction because the property that is the subject of this litigation is located in Texas, and Defendants are doing business within this state. The transaction and events which are the subject matter of this Complaint all occurred within the County of Dallas, State of Texas. Venue in this cause is proper in Dallas County, Texas pursuant to Section 17.56 of the Texas Business and Commerce Code

and under Section 15.001 of the Texas Civil Practice and Remedies Code because this action involves real property and the property is located in Dallas County, Texas. Furthermore, the court has jurisdiction under 28 U.S.C. § 1331 (federal question); 15 U.S.C. § 1601, et seq (TILA); 15 U.S.C. § 1692, Fair Debt Collection Practices Act; 12 U.S.C. § 2601 (RESPA); 28 U.S.C. § 1367 (Supplemental Jurisdiction) and the Home Ownership and Equity Protection Act ("HOEPA") 12 U.S.C. & 1451 et seq. The court also has jurisdiction under all applicable federal jurisdiction involving financial institutions involved in the mortgage fraud area such as the Mortgage Fraud Act under 18 U.S.C. § 1006 (2007).

### IV. BACKGROUND

6.  Plaintiff Kevin Burns is the owner of the property located at 243 Barnes Bridges Rd, Sunnyvale, TX 75182 in Dallas County. ("the subject property " or "property in question"), under a deed thereto recorded in the office of the Dallas County Clerk SEE LEGAL DESCRIIPTION ATTACHED HERETO AND MADE A PART HEREOF.

7.  On or about September 26, 2008, Plaintiff executed a Promissory Note in favor of First Houston Mortgage LTD. *(see exhibit "A")*. On or about September 26, 2008, Plaintiff made and delivered the Deed of Trust, conveying the subject property in trust for the purposes recited therein. *(see exhibit "B" )*  First Houston Mortgage, LTD was identified as the "Lender" in both the Note and Deed of Trust.

8.  On or about **February 10, 2011** MERS, as nominee for First Houston Mortgage LTD assigned the Deed of Trust to Chase Home Finance, LLC recorded as Clerks File No. 2008032194 in the official real property records of Dallas County. This assignment is "backdated to be effective" on **January 5, 2011.** *(see exhibit "C")*

9.  On or about **March 3, 2012,** MERS assigned the Deed of Trust to JP Morgan Chase N A, successor by merger to Chase Home Finance, LLC *(see exhibit "D")*

### V.BRIEF STATEMENT

10. Plaintiff alleges that the assignment of the Deed of Trust, dated March 3, 2012 from MERS to Defendant JPMC that purports to "convey, grant, sell, assign, transfer and set over the described deed of trust with all interest secured thereby, all liens, and any rights due or to become due or to become due thereon" is insufficient for a transfer of the promissory note because the note that evidenced the mortgage was "securitized" into the Fannie Mae Remic Trust 2008-91 after First Houston Mortgage, LTD endorsed the note over to JPMorgan Chase Bank N.A.on a unspecified date in 2008 *(see exhibit A. pg. 4).* Therefore, the Fannie Mae Remic Trust 2008-91 is the purported true owner or holder of the note. MERS, despite the language in the deed of trust that implies a transfer of the note to JPMC, had no ownership or interest that it could transfer as nominee because First Houston Mortgage, LTD had already sold the mortgage in 2008 before either purported assignment, as referenced above, had occurred. Since there can only be one note or mortgage for Plaintiffs property, there is a <u>genuine controversy</u> as to the actual identity of which entity is the owner of the note or at least the holder in due course.

### VI. AUTHORITIES AND ALLEGATIONS

11. In *McCarthy v Bank of America, N.A. (N.D. Tex., Dec.22, 2011. No. 4:11-cv-00356)* it was established by the court that MERS is recognized as a "book entry system" or holder of a security instrument, and meets the definition by the Texas Property Code of a "mortgagee" and that BOA, through assignment of the deed of trust from MERS, became the holder of a security instrument or mortgagee. However, *McCarthy* held that "if the holder of the deed of trust does not own or hold the note, the deed of trust serves no purpose, is impotent, and cannot be a vehicle for depriving the grantor of the deed of trust of ownership of the of the property described in the deed of trust" and that "the court <u>disagrees</u> with the contention of BOA that BOA did not have to be the owner or holder of the note to proceed with the foreclosure sale." *Id.*

12. Plaintiff has attached a copy of a securitization audit of the Remic Trust 2008-91 Trust *(see exhibit E)* that identifies Fannie Mae and JP Morgan as the Sponsor/Seller of the note into the Remic trust. Defendant JPMC claims ownership of the note by assignment of the deed of trust from MERS, however Fannie Mae, on its website www.fanniemae.gov. identifies and claims ownership of this very same property under its "Loan Look-up" function. This function allows a homeowner to view and identify if their particular mortgage is owned by Fannie Mae. The audit shows that in 2008, Fannie Mae claims the Plaintiffs property as part of its portfolio. *(see exhibit E pg.4)* Yet JPMC, by virtue of an assignment of the deed of trust from MERS claims the same ownership in 2012. Both cannot be accurate, which in turn creates a "cloud" upon the title for which Plaintiff is suing for Quite Title relief.

13. The function of the Plaintiff's deed of trust is described as follows: "this Security Instrument secures to Lender: (i) the repayment of the loan and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note." *(See deed of trust pg. 2.)* Without ownership of the note, which is the actual debt, or without being the holder of the note, the note cannot be conveyed, sold, assigned, or transferred to a another entity. *(See the description of the underlying facts in Bank of New York v. Raftogianis, 417 N.J. Super. 467 (ch. div. 2010).* As noted in *Raftogianis*, there is no function for a mortgage separate from the note. MERS is not the payee of the promissory note and MERS never held the promissory note. The deed of trust designated First Houston Mortgage, LTD, or any holder of the note who is entitled to receive payment of the note, as the "Lender." MERS, under the limited capacity and function of its role, acting solely as nominee for the Lender, simply holds the mortgage lien that a lender has over a borrower's asset used as collateral, legally allowing the deed of trust beneficiary the right to foreclose upon default, on behalf of the actual promissory note owner. According to the attached promissory note, *(exhibit A)* JPMC would have been the entity "entitled to receive payment of the note **IF** JPMC had not sold/sponsored the note into the Fannie Mae Remic Trust 2008-91 at some point in 2008.

14. Plaintiff alleges that despite the fact that Texas foreclosure law does not require possession or production of the original note by a mortgage holder or servicer, JPMC has not established, that it (1) has actual ownership of the note or (2) that it is acting as agent or nominee on the note owner's behalf, (Fannie Mae Remic Trust 2008-91), with authority to conduct a foreclosure for the benefit of the owner or holder of the note.

15. Defendant JPMC has entered into the court record evidence of an assignment from MERS to JPMC that purports to "convey, grant, sell, assign, transfer and set over the described deed of trust with all interest secured thereby, all liens, and any rights due or to become due or to become due thereon."   However, JPMC has not, as required by the opinion in *Martins v. BAC Home Loan Servicing, L.P. et, al.* (No. 12-20559, June 26, 2013, U S Court of Appeals 5th Cir.), attached a "photocopy" of the <u>original note</u> to a sworn affidavit admissible as a 'true and correct copy of the original mortgage note" therefore, this omission is a failure to meet the procedural requirements contained in the Texas Property Code Chapter 51 for a foreclosure.

16. Defendant JPMC, in receiving the assigned interest in the deed of trust from MERS, became the "holder of a security instrument" or mortgagee. Any agreement between the mortgagee and servicer to service the mortgage would be evident, through disclosure between the two parties of such representation as required under Sec. 51.002 (b) of the Tex. Prop. Code, or if JPMC is its own mortgage servicer, it could bring the foreclosure action itself. However, *McCarthy* concludes that, "inherent in the procedural steps outlined in the Texas Property Code is the assumption that whatever entity qualifies as a "mortgagee" either owns the note or is serving as an agent for the owner or holder of the note; and, the statue assumes that when a foreclosure is conducted by someone other than the owner or holder of the note, the person conducting the foreclosure will be acting as agent or nominee for the owner or holder." *Id.*

17. In *McCarthy,* the court explained further "[t]hat it is not to say that the owner or holder of the note cannot arraign for an agent or nominee, acting on its behalf, to conduct a foreclosure for the benefit of the owner or holder of the note. But the court also correctly surmised that "it's quite a different proposition from assertions that the holder of the deed of trust who does not own or hold the note has the power to transfer the note from the original note holder to another and that an entity that does not own or hold the note can conduct a foreclosure under the deed of trust. The sole purpose of the deed of trust is to secure payment of the note. The very, and sole, purpose of a foreclosure sale pursuant to the deed of trust is to obtain funds for payment of the note. If the holder of the deed of trust does not own or hold the note, and there were to be a foreclosure under the deed of trust, there is no assurance that the proceeds of the foreclosure would be used for the purpose intended by the deed of trust , i.e., to be applied as payment of, or on, the note". *Id*

18. The United States Court of Appeals for the Fifth Circuit has considered the chain of title requirements in its decision *Re: Reinagel V. Deutsche Bank Nat'l Trust No. 12-50569,* and has held that under the *Restatement (Third) of Property: Mortgages,* "the transfer of a mortgage *presumptively* includes the note secured by the mortgage, whether or not the instrument of assignment expressly references the note[1] and that" it is intuitive that a party seeking to foreclose must have the right to enforce the debt it seeks to satisfy[2]". Contrary to long standing, basic principles governing the relationship between real estate borrowers and the secured real estate lenders, Texas courts tend to follow the *Restatement,* [3] however, they have <u>never expressly adopted</u> its note-follows the- mortgage presumptions.

---

1. Id. § 5.4 (b). As the comments to § 5.4 of the *Restatement (Third) of Property: Mortgages* explain: It is conceivable that on rare occasions a mortgagee will wish to disassociate the obligation and the mortgage, but that result should follow only upon evidence that the parties to the transfer so agreed. The far more common intent is to keep the two rights combined… This section's purpose is generally to achieve the same result even if one of the two aspects of the transfer is omitted.

2. See, e.g., RESTATEMENT (THIRD) OF PROPERTY: MORTGAGES § 5.4 © (1997)

   ("A mortgage may be enforced only by, or in behalf of, a person who is entitled to enforce the obligation the mortgage secures").

3. See, e.g., Conversion Props., LLC v Kessler, 994 S.W. 2d 810,813 (Tex. Ct. App. 1999).

19. According to *Black's Law Legal Dictionary 2nd Ed.,* a "presumption" of something is defined as: "an act or instance of taking something to be true or adopting a particular attitude toward something, especially at the start of a chain of argument or action."

20. Consequently, there must be <u>something more concrete</u> than a "presumption" that a transfer of the deed of trust automatically "transfers" the note with it. *Reinagel* makes it clear that "it was not determined that the Texas Supreme Court would follow the *Restatement". Id.* However, the attachment of "a "photocopy" of the promissory note to an affidavit in which the affiant swears is a true and correct copy of the original may establish <u>the existence</u> of the note", and provide evidence of an interest in the debt owed by the Plaintiff before conducting a foreclosure. *Martins v. BAC Home Loan Servicing, L.P. et, al.* (No. 12-20559, June 26, 2013, U S Court of Appeals 5th Cir.), quoting *Blankenship v. Robins,* 899 S.W. 2d 236,238 (Tex. App.—Houston [14[th] Dist.] 1994, no writ).

21. In fact, JPMC has not offered any evidence to establish propriety beside a "presumption" of a transfer under guidelines not expressly adopted by Texas courts. Plaintiff's argument is that JPMC has not established actual ownership of the note, nor a photocopy of the note attached to an affidavit, or that it is acting as agent or nominee on the note owner's behalf, with uncontestable authority to conduct a foreclosure for the benefit of the owner or holder of the note. The note made no reference to MERS. Why? Because MERS did not own the note, is not mentioned in the note, could not assign the note, and therefore, its assignment of the deed of trust to JPMC, was just that. An assignment of the collateral or deed of trust that secures the note <u>for the owner or holder of the note.</u>

## VII. QUITE TITLE

22. The lack of certainty as to the transfer of the note, if any, potentially subjects Plaintiff to multiple and unpredictable recoveries or attempts to recover against the subject property. The first and second elements of a claim for Quite Title are satisfied, in that the complaint shows (1) an interest in a specific property; and that (2) title to the Property is affected by a claim by the Defendant. In regards to the third (3) element of a quite title lawsuit, Plaintiffs allege that the Defendant cannot establish possession of a valid, enforceable lien to Plaintiff s property because "the claim, although facially valid, is invalid or unenforceable because JPMC has not shown conclusively the facts necessary to establish propriety (i.e. actual possession of the mortgage note, a "photocopy", as holder of the note attached to a sworn affidavit or that it is acting on

behalf of the note owner or holder). Plaintiff, as the holder of the Superior Title to the property in fee simple, alleges that the JPMC claim of a lien on the property is unenforceable and without validity because the assignment that purports to transfer such title to JPMC does not transfer an interest in the note. Plaintiff has established the existence of a potential "dual claim of ownership" by two different parties through the securitization of the original mortgage note into the Fannie Mae Remic Trust 2008-91. The uncertainty as to who owns, or who is the holder in due course of the note constitutes a "cloud" on Plaintiff's title which can only be removed by requiring all such assignees to appear and assert their interests and the extent to which any obligation owing to them has not been discharged by payment, including collections on insurance against default (i.e. credit default swaps) or, failing such assertion of claims, entry of a decree of quiet title freeing title to the subject property of the liens of the trust deed and leaving any obligations under the note unsecured by any interest in the subject property.

23. The inability of Plaintiff to safely discharge any lien of the trust deed against the subject property in favor of the proper holder (s) of the note and the threat of multiple recoveries or attempts to recover against the subject property, The Court, pursuant to Texas Civil Practice and Remedies Code§ 15.011 *et seq.*, should enter an Order quieting title to the subject property in favor of Plaintiff and against JPMC et al.

## VIII. TEXAS BUSINESS & COMMERCE CODE VIOLATION

24. The Texas Business and Commerce Code states that only a "Holder" of an instrument, or a non-holder in possession of the instrument, is entitled to enforce the instrument, whether that be through enforcement of the Deed of Trust or any other manner. A foreclosure action is merely a collection action on a negotiable instrument. Therefore, in this case, the negotiable instrument is the Original Mortgage Promissory Note. The Deed of Trust is merely the instrument securing the Original Mortgage Promissory Note. Although the Texas Property Code formulates the procedure by which a Deed of Trust may be used as a security instrument to collect on a mortgage, "inherent in the procedural steps outlined in the Texas Property Code is the assumption that whatever entity qualifies as a "mortgagee either owns the note or is serving as an agent for the owner or holder of the note; and, the statue assumes that when a foreclosure is conducted by someone other than the owner or holder of the note, the person conducting the foreclosure will be acting as agent or nominee for the owner or holder" As defined by the procedural steps of the Texas Property Code, the Deed of Trust is wholly worthless and invalid if there is no note for it to secure. JPMC is identified as both "servicer" and "mortgagee" in the Substitute Trustee Deed currently filed and recorded in the Dallas County records.

25. It is very likely that Defendant JPMC is not the owner or holder of the original note and is not the duly authorized representative(s) of the current actual owner or holder of the original note and that JPMC had no right to attempt to enforce such note. As such, JPMC lacked the authority to conduct a trustee sale of Plaintiff's property. Furthermore, allowing the foreclosure of Plaintiff's property to stand would unfairly and illegally expose Plaintiff to potential dual liability on the alleged debt.

## IX. TEXAS FINANCE CODE VIOLATION

26. Because JPMC has not provided any evidence that it is in fact the owner or holder of the original note or the duly authorized representative of the owner or holder of the original note, it has no authority to collect on the note. JPMC has nonetheless engaged in actions to collect on such note. These actions are thereby fraudulent, deceptive, and/or misleading representations actionable under the Texas Finance Code §§392.303 and 392.304, the Texas Debt Collection Act (TDCA).

27. Defendant JPMC therefore is in violation of Texas Finance Code Sections 392.301 (8), having no authority to collect on the Note or hold a Substitute Trustee's Sale.

28. All alleged transfers, assignments, and misstatements of facts regarding the note by Defendant JPMC, and the failure of JPMC to verify that it is the holder of the note, constitute violations of the Texas Finance Code.

## X. JURY DEMAND

Plaintiff hereby demands trial by jury. (Rule 38 of the Federal Rule of Civil Procedure) Should any party acting in an official capacity secured by oath of office with bond, or by any party with whom you claim an affiliations, infringe upon my guaranteed and secured rights, I will scrutinize said infringements and any injury there from, pursuant to 42 USC § 1983 and  USC § 1985 and 18 USC § 241-242 at minimum, I will proceed accordingly.

## XI. PRAYER

Plaintiff's First Verified Amended Complaint

Page 10 of 11

**WHEREFORE,** Plaintiff prays that Defendants be cited to appear and answer herein, and that Upon final hearing, Plaintiff be awarded judgment:

    a. Declaring that Defendants lack any interest in the subject property which would permitted them to foreclose, evict, or attempt to foreclose or evict, the Trust Deed and/or to sell the subject properties;

    b. Declaring that the Trust Deed is not a lien against the subject property, ordering the immediate release of the Trust Deed of record, and quieting title to the subject property in Plaintiff against Defendants and all claiming by, though, or under them;

    c. Pre- and post-judgment interest at the maximum rate allowed by law;

1. For Compensatory Damages in an amount to be determined by proof at trial
2. For Special Damages in an amount to be determined by proof at trial
3. For General Damages in an amount to be determined by proof at trial
4. For Punitive Damages in an amount to be determined by proof at trial
5. For Restitution as allowed by law
6. For Fees and Costs of this action
7. For Declaratory Relief, including but not limited to the following Decrees of this Court That:

    a. Plaintiff is the prevailing party

    b. The Trustees of the REMIC Trusts have no enforceable secured or unsecured claim against the 'Property'

    c. The Sponsor has no enforceable secured or unsecured claim against the "Property"

    d. The Depositor has no enforceable secured or unsecured claim against the "Property"

    d. The Mortgage Originator has no enforceable secured or unsecured claim against the "Property"

    e. Attorney's fees; and

    f. For such other and further relief to which Plaintiff may show himself justly entitled.

Respectively Submitted

Kevin Burns
243 Barnes Bridge Road
972-489-3015



KEVIN BURNS

Data ID: 581

# NOTE

MIN:

September 25, 2008

SUNNYVALE
[City]

TEXAS
[State]

243 BARNES BRIDGE ROAD
SUNNYVALE, TEXAS 75182
[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 368,200.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is FIRST HOUSTON MORTGAGE, LTD. I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 6.750%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3. PAYMENTS**

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the first day of each month beginning on November 1, 2008. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on October 1, 2038, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 5100 WESTHEIMER, SUITE 320, HOUSTON, TEXAS 77056 or at a different place if required by the Note Holder.

**MULTISTATE FIXED RATE NOTE** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3200  1/01
(Page 1 of 4 Pages)



INITIALS: _____

EXHIBIT "A"

Data ID: 581

(ii) Amount of Monthly Payments
My monthly payment will be in the amount of U.S. $ 2,388.14.

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charge for Overdue Payments
If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.00 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

MULTISTATE FIXED RATE NOTE • Single Family • Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3200   1/01
(Page 2 of 4 Pages)





INITIALS

Data ID: 581

**IVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**MULTISTATE FIXED RATE NOTE** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3200  1/01
(Page 3 of 4 Pages)



INITIALS: 

Loan No:

Data ID: 581

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____(Seal)
KEVIN BURNS —Borrower

*[Sign Original Only]*

PAY TO THE ORDER OF
WITHOUT RECOURSE   JPMorgan Chase Bank, NA

FIRST HOUSTON MORTGAGE, LTD

By: _____

Its: **Dana Gompers**
(Printed Name and Title)
**Managing Partner**

MULTISTATE FIXED RATE NOTE - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3200  1/01
(Page 4 of 4 Pages)



Capital Title

GF# OB-059736-RW

Loan No: 52700104
Borrower: KEVIN BURNS

Data ID: 581

Return to: DSL LOAN DOCS
ATTENTION: FINAL DOCS
5100 WESTHEIMER, SUITE 370
HOUSTON, TX 77056

DT    20080321194

15 PGS

[Space Above This Line For Recording Data]

## DEED OF TRUST

MIN: 1002338105271001045

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated September 26, 2008, together with all Riders to this document.

(B) "Borrower" is KEVIN BURNS, A SINGLE MAN . Borrower is the grantor under this Security Instrument.

(C) "Lender" is FIRST HOUSTON MORTGAGE, LTD. Lender is A LIMITED PARTNERSHIP organized and existing under the laws of the State of TEXAS. Lender's address is 5100 WESTHEIMER, SUITE 320, HOUSTON, TX 77056. Lender includes any holder of the Note who is entitled to receive payments under the Note.

(D) "Trustee" is ASHLEY B PATTEN. Trustee's address is 2500 WEST LOOP SOUTH #150 HOUSTON, TX 77027.

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated September 26, 2008. The Note states that Borrower owes Lender THREE HUNDRED SIXTY-EIGHT THOUSAND TWO HUNDRED and NO/100-----Dollars (U.S. $ 368,200.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than October 1, 2038.

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

TEXAS - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3044   1/01    (Page 1 of 12 Pages)

P+52700104+8619+01+12+TXCNVADT



EXHIBIT "B"

Loan No: 52700104

Data ID: 581

(I) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider  ☐ Condominium Rider  ☐ Second Home Rider
☐ Balloon Rider  ☐ Planned Unit Development Rider
☐ 1-4 Family Rider  ☐ Biweekly Payment Rider
☐ Other(s) [specify]

(J) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) **"Escrow Items"** means those items that are described in Section 3.

(N) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of DALLAS:

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF

**TEXAS** - Single Family - Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**

Form 3044    1/01    (Page 2 of 12 Pages)

P+52700104+8619+02+12+TXCNVADT

Loan No: 52700104                                          Data ID: 581

which currently has the address of 243 BARNES BRIDGE ROAD,
                                        [Street]

SUNNYVALE, TEXAS                        75182         ("Property Address"):
[City]                                  [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**TEXAS** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
                                        Form 3044    1/01        (Page 3 of 12 Pages)



P+52700104+8619+03+12+TXCNVADT

Loan No: 52700104

Data ID: 581

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**TEXAS** - Single Family - Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**

Form 3044   1/01   (Page 4 of 12 Pages)



P+52700104+8519+04+12+TXCNVADT

Loan No: 52700104                                                   Data ID: 581

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.



**TEXAS** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3044   1/01                                                    (Page 5 of 12 Pages)

P+52700104+8619+05+12+TXCNVADT

Loan No: 52700104                                                   Data ID: 581

7.  Preservation, Maintenance and Protection of the Property; Inspections.  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition.  Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage.  If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.  Borrower's Loan Application.  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.  Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument, (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease.  If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.  Mortgage Insurance.  If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

**TEXAS** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

                          Form 3044   1/01        (Page 6 of 12 Pages)




P+52700104+9819+06+12+TXCNVADT

Loan No: 52700104

Data ID: 581

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.



TEXAS - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3044    1/01    (Page 7 of 12 Pages)

P+52700104+8619+07+12+TXCNVADT

Loan No: 52700104                                                    Data ID: 581

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**TEXAS** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3044   1/01      (Page 8 of 12 Pages)

P+52700104+8619+08+12+TXCNVADT

Loan No: 52700104                                                                 Data ID: 581

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

**TEXAS** - Single Family - Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**

Form 3044    1/01         (Page 9 of 12 Pages)



P+52700104+8519+09+12+TXCNVADT

Loan No: 52700104

Data ID: 581

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice will result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence. For the purposes of this Section 22, the term "Lender" includes any holder of the Note who is entitled to receive payments under the Note.

If Lender invokes the power of sale, Lender or Trustee shall give notice of the time, place and terms of sale by posting and filing the notice at least 21 days prior to sale as provided by Applicable Law. Lender shall mail a copy of the notice to Borrower in the manner prescribed by Applicable Law. Sale shall be made at public venue. The sale must begin at the time stated in the notice of sale or not later than three hours after that time and between the hours of 10 a.m. and 4 p.m. on the first Tuesday of the month. Borrower authorizes Trustee to sell to the highest bidder for cash in one or more parcels and in any order Trustee determines. Lender or its designee may purchase the property at any sale.

TEXAS - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3044    1/01    (Page 10 of 12 Pages)



P+52700104+8619+10+12+TXCNVADT

Trustee shall deliver to the purchaser Trustee's deed conveying indefeasible title to the Property with covenants of general warranty from Borrower. Borrower covenants and agrees to defend generally the purchaser's title to the Property against all claims and demands. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

If the Property is sold pursuant to this Section 22, Borrower or any person holding possession of the Property through Borrower shall immediately surrender possession of the Property to the purchaser at that sale. If possession is not surrendered, Borrower or such person shall be a tenant at sufferance and may be removed by writ of possession or other court proceeding.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall provide a release of this Security Instrument to Borrower or Borrower's designated agent in accordance with Applicable Law. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee; Trustee Liability.** All rights, remedies and duties of Trustee under this Security Instrument may be exercised or performed by one or more trustees acting alone or together. Lender, at its option and with or without cause, may from time to time, by power of attorney or otherwise, remove or substitute any trustee, add one or more trustees, or appoint a successor trustee to any Trustee without the necessity of any formality other than a designation by Lender in writing. Without any further act or conveyance of the Property the substitute, additional or successor trustee shall become vested with the title, rights, remedies, powers and duties conferred upon Trustee herein and by Applicable Law.

Trustee shall not be liable if acting upon any notice, request, consent, demand, statement or other document believed by Trustee to be correct. Trustee shall not be liable for any act or omission unless such act or omission is willful.

25. **Subrogation.** Any of the proceeds of the Note used to take up outstanding liens against all or any part of the Property have been advanced by Lender at Borrower's request and upon Borrower's representation that such amounts are due and are secured by valid liens against the Property. Lender shall be subrogated to any and all rights, superior titles, liens and equities owned or claimed by any owner or holder of any outstanding liens and debts, regardless of whether said liens or debts are acquired by Lender by assignment or are released by the holder thereof upon payment.

26. **Partial Invalidity.** In the event any portion of the sums intended to be secured by this Security Instrument cannot be lawfully secured hereby, payments in reduction of such sums shall be applied first to those portions not secured hereby.

27. **Purchase Money; Owelty of Partition; Renewal and Extension of Liens Against Homestead Property; Acknowledgment of Cash Advanced Against Non-Homestead Property.** Check box as applicable:

☒ **Purchase Money.**
The funds advanced to Borrower under the Note were used to pay all or part of the purchase price of the Property. The Note also is primarily secured by the vendor's lien retained in the deed of even date with this Security Instrument conveying the Property to Borrower, which vendor's lien has been assigned to Lender, this Security Instrument being additional security for such vendor's lien.

☐ **Owelty of Partition.**
The Note represents funds advanced by Lender at the special instance and request of Borrower for the purpose of acquiring the entire fee simple title to the Property and the existence of an owelty of partition imposed against the entirety of the Property by a court order or by a written agreement of the parties to the partition to secure the payment of the Note is expressly acknowledged, confessed and granted.

☐ **Renewal and Extension of Liens Against Homestead Property.**
The Note is in renewal and extension, but not in extinguishment, of the indebtedness described on the attached Renewal and Extension Exhibit which is incorporated by reference. Lender is expressly subrogated to all rights, liens and remedies securing the original holder of a note evidencing Borrower's indebtedness and the original liens securing the indebtedness are renewed and extended to the date of maturity of the Note in renewal and extension of the indebtedness.

☐ **Acknowledgment of Cash Advanced Against Non-Homestead Property.**
The Note represents funds advanced to Borrower on this day at Borrower's request and Borrower acknowledges receipt of such funds. Borrower states that Borrower does not now and does not intend ever to reside on, use in any manner, or claim the Property secured by this Security Instrument as a business or residential homestead. Borrower disclaims all homestead rights, interests and exemptions related to the Property.

P+52700104+8619+11+12+TXCNVADT

Loan No: 52700104                                                Data ID:  581

28.  **Loan Not a Home Equity Loan.**  The Loan evidenced by the Note is not an extension of credit as defined by Section 50(a)(6) or Section 50(a)(7), Article XVI, of the Texas Constitution.  If the Property is used as Borrower's residence, then Borrower agrees that Borrower will receive no cash from the Loan evidenced by the Note and that any advances not necessary to purchase the Property, extinguish an owelty lien, complete construction, or renew and extend a prior lien against the Property, will be used to reduce the balance evidenced by the Note or such Loan will be modified to evidence the correct Loan balance, at Lender's option.  Borrower agrees to execute any documentation necessary to comply with this Section 28.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.



....................................................(Seal)
KEVIN BURNS —Borrower

[Space Below This Line For Acknowledgment]

State of TEXAS                              §
County of ~~DALLAS~~ Rockwall               §

This instrument was acknowledged before me on the 26 day of September 20 08 by

KEVIN BURNS

ROBIN CIESZINSKI
Notary Public, State of Texas
My Commission Expires
February 07, 2010

....................................................
Notary Public

....................................................
(Printed Name)

My commission expires:

UNOFFICIAL

TEXAS - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3044    1/01        (Page 12 of 12 Pages)

P+52700104+8619+12+12+TXCNVADT

Escrow File No.: 08-059736-RW

## EXHIBIT "A"

Being a lot, tract or parcel of land situated in the James West Survey, Abstract No. 1582, in the City of Sunnyvale, Dallas County, Texas, and being out of a 26.942 acre tract and a 15.44 acre tract of land as recorded in Volume 73166, Page 673 of the Deed Records of Dallas County, Texas, and being more particularly described as follows:

BEGINNING at an 1/2 inch iron rod found in the North line of Barnes Bridge Road (a 50 foot right-of-way), same also being in the South line of James West Survey, Abstract No. 1582;

THENCE North 88 degrees 46 minutes 08 seconds West, along said South line of James West Survey, Abstract No. 1582, a distance of 398.47 feet to a 1/2 inch iron rod found for corner;

THENCE North 00 degrees 20 minutes 32 seconds East, a distance of 1251.62 feet to a point for corner in the centerline of Duck Creek;

THENCE with the meanders of said Duck Creek as follows:

South 87 degrees 06 minutes 59 seconds East, 133.54 feet;

South 80 degrees 10 minutes 03 seconds East, 68.00 feet;

North 51 degrees 55 minutes 24 seconds East, 58.45 feet;

THENCE South 01 degrees 29 minutes 10 seconds West, a distance of 988.37 feet to a 1/2 inch iron rod found for corner;

THENCE South 57 degrees 19 minutes 25 seconds East, a distance of 375.63 feet to a 1/2 inch iron rod found for corner in the Northwest right-of-way line of Barnes Bridge Road;

THENCE South 60 degrees 19 minutes 25 seconds West, along said Northwest right-of-way line of Barnes Bridge Road, a distance of 56.50 feet to a 1/2 inch iron rod found for corner and the beginning of a curve to the left, having a radius of 1936.00 feet, a central angle of 03 degrees 21 minutes 35 seconds, a chord bearing of South 58 degrees 38 minutes 37 seconds West, a chord distance of 113.51 feet;

THENCE along said curve to the left, an arc length of 113.52 feet to the POINT OF BEGINNING and containing 345,189.114 square feet or 7.9245 acres of land, more or less.

A portion of the above described property now known as Lot 1, Johnson Acres, an addition to the City of Sunnyvale, recorded in Volume 95061, Page 990, Plat Records, Dallas County, Texas.

**ELECTRONICALLY RECOR▢        201100047256**
**02/23/2011 01:34:56 PM AL  1/3**

Prepared by, and upon recording please return to:
Barrett, Daffin, Frappier, Turner and Engel, LLP
15000 Surveyor Boulevard, Suite 500                     Loan Type: Conventional
Addison, Texas 75001

### ASSIGNMENT OF DEED OF TRUST

FOR VALUE RECEIVED, receipt of which is acknowledged, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR FIRST HOUSTON MORTGAGE, LTD, ITS SUCCESSORS AND ASSIGNS, PO Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS, and existing under the law of Delaware, mortgagee of record of that one certain loan agreement evidenced by a promissory note and security instrument or deed of trust dated 09/26/2008 (the "Loan Agreement"), in the amount of $248,280.00, made or granted by KEVIN BURNS (Borrower) and recorded as CLERK'S FILE NO. 20080321194, in the official real property records of DALLAS County, Texas, GRANTS, ASSIGNS, AND TRANSFERS all rights accrued and to accrue under said Loan Agreement to CHASE HOME FINANCE, LLC, 3415 VISION DR. COLUMBUS, OH 43219.

Describing land therein:

SEE EXHIBIT "A" ATTACHED HERETO AND INCORPORATED HEREIN FOR ALL PURPOSES.

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR FIRST HOUSTON MORTGAGE, LTD ITS SUCCESSORS AND ASSIGNS

Executed on **FEB 10 2011** to be
effective on: **January 03, 2011**

By: _____
Stephen C. Porter, Assistant Secretary

### CORPORATE ACKNOWLEDGEMENT

State of      Texas §

County of    Dallas §

Before me, the undersigned Notary Public, on this day personally appeared Stephen C. Porter, Assistant Secretary of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR FIRST HOUSTON MORTGAGE, LTD, ITS SUCCESSORS AND ASSIGNS, a corporation, known to me to be the person whose name is subscribed to the foregoing instrument and on behalf of said corporation acknowledged to me that he/she executed the same for the purposes and consideration therein expressed. **FEB 10 2011**

Given under my hand and seal of office this ____ day of _____ 2011.

_____
Notary Public/Signature

My Commission Expires: 3/20/13

Georgia Ann Bradley
_____
Printed Name of Notary Public

GEORGIA ANN BRADLEY
Notary Public
State of Texas
My Comm. Exp. 03-20-2013

ASSG2011018740037▢

### HOLD FOR BDF

EXHIBIT "C"



04/16/2012 10:37:44 PM

2012080101428
AL 1/2

## CORPORATE ASSIGNMENT OF DEED OF TRUST

- - Contact JPMORGAN CHASE BANK, N.A. for this instrument 780 Kansas Lane, Suite A, Monroe, LA 71203, telephone # (866) 756-8747, which is responsible for receiving payments.

Loan #: 1847412508

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR FIRST HOUSTON MORTGAGE, LTD., ITS SUCCESSORS AND ASSIGNS (MERS Address: P.O. Box 2026, Flint, Michigan 48501-2026) by these presents does convey, grant, sell, assign, transfer and set over the described Deed of Trust with all interests secured thereby, all liens, and any rights due or to become due thereon, to JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, WHOSE ADDRESS IS 700 KANSAS LANE, MC 8000, MONROE, LA 71203 (866)756-8747, ITS SUCCESSORS OR ASSIGNS, (ASSIGNEE).

Said Deed of Trust dated 09/26/2008 executed by KEVIN BURNS in the amount of $368,200.00 and recorded on 10/03/2008 as Instrument # 20080321194, in Book n/a, Page n/a in the records of Real Property of DALLAS County, Texas.
SEE EXHIBIT "A" ATTACHED

IN WITNESS WHEREOF, this Assignment is executed on 03/28/2012 (MM/DD/YYYY).

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR FIRST HOUSTON MORTGAGE, LTD, ITS SUCCESSORS AND ASSIGNS

By: *LeShonda Anderson*
LeShonda Anderson
VICE PRESIDENT

STATE OF FLORIDA     COUNTY OF PINELLAS
The foregoing instrument was acknowledged before me on 03/28/2012 (MM/DD/YYYY), by LeShonda Anderson as VICE PRESIDENT for MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR FIRST HOUSTON MORTGAGE, LTD., ITS SUCCESSORS AND ASSIGNS, who, as such VICE PRESIDENT being authorized to do so, executed the foregoing instrument for the purposes therein contained. He/she/they is (are) personally known to me.

Miranda Avila
Notary Public - State of FLORIDA
Commission expires: 08/22/2014

Miranda Avila
Notary Public State of Florida
My Commission # EE 019063
Expires August 22, 2014

Document Prepared By: Robert E. Fletcher - c/o NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683
(800)346-9152
When Recorded Return To: JPMorgan Chase Bank, NA, C/O NTC 2100 Alt. 19 North, Palm Harbor, FL 34683
JPCAS 16120059 -- CHASE CJ3661328  MIN 100273800527001045 MERS PHONE 1-888-679-MERS
FORM5VFRMTXG1

*16120059*

## EXHIBIT "D"

# COME AS YOU ARE COMMUNITY DEVELOPMENT

## 545 John Carpenter Freeway, #300

**972-719-9102**
www.comeasyouarecd.com, support@comeasyoucd.com

### CAYACO ANALYSIS SECURITIZATION REPORT

*Prepared for:*

## KEVIN BURNS

*For Property Address*

**243 Barnes Bridge Road**
**SUNNYVALE, TX 75182**

*Prepared on:*

*July 12, 2012*

EXHIBIT "E"

# COME AS YOU ARE COMMUNITY DEVELOPMENT

## SECTION 1:    TRANSACTION DETAILS

### BORROWER & CO-BORROWER:

| BORROWER | CO-BORROWER |
|---|---|
| KEVIN BURNS | N/A |
| **CURRENT ADDRESS** | **SUBJECT ADDRESS** |
| SUNNYVALE, TX | 243 Barnes Bridge Road SUNNYVALE, TX 75182 |

## SECTION 2:    SECURITIZATION
### SECURITIZATION PARTICIPANTS:

| ORIGINATOR/LENDER | SPONSOR/SELLER | DEPOSITOR |
|---|---|---|
| FIRST HOUSTON MORTGAGE, LTD. | FANNIE MAE / JP MORGAN | N/A |
| **ISSUING ENTITY** | **TRUSTEE** | **MASTER SERVICER/ SERVICER** |
| FANNIE MAE REMIC TRUST 2008-91 | FANNIE MAE | FANNIE MAE |
| **CUSTODIAN** | **CUT – OFF DATE** | **SETTLEMENT DATE** |
| FANNIE MAE | NOT STATED | NOVEMBER 28, 2008 |

# COME AS YOU ARE COMMUNITY DEVELOPMENT

1. On **July 12, 2012** I researched the **Bloomberg** online Database at the request of **Certified Forensic Loan Auditors, LLC** on behalf of KEVIN BURNS whose property address is noted herein above.

2. Based on the information I have received, **KEVIN BURNS** signed a Note in favor of **First Houston Mortgage, Ltd.** on **September 26, 2008** for **$368,200.00** with the **Loan Number 100273.**

3. The loan was not identified in a trust in Bloomberg. The documentation provided (the deed of trust; note; and assignment of deed of trust) did not state the loan number.  No loans were found in the Bloomberg database having all the characteristics of the loan.

4. The search criteria used to try and locate the loan was based on the following factors/information that corresponds exactly with **KEVIN BURNS** loan documents in my possession: Original Amount: **$368,200.00**; Location of Property: **TX**; Property Type: **Single Family Residence**; Occupied By:  **Owner Occupied**; Zip Code: 75182 Origination Date: **September 26, 2008**.

5. Fannie Mae states ownership of the loan on its web site.  While Fannie Mae does not generally disclose loan level detail in publically reported trusts, the Fannie Mae REMIC Trust 2008-91, which has a settlement date of November 28, 2008, meets the qualifications for securitization of the loan within the REMIC period.


Michael Carrigan
**Certified Forensic Loan Auditors, LLC**
**13101 West Washington Blvd. Suite 140**
**Los Angeles, CA 90066**

# COME AS YOU ARE COMMUNITY DEVELOPMENT

## LOAN SEARCH

**Fannie Mae claims ownership of the loan in its web site as follows:**



# COME AS YOU ARE COMMUNITY DEVELOPMENT

## **BLOOMBERG**

### *SECURITY DESCRIPTION:*



### *GROUP DESCRIPTION:*

# COME AS YOU ARE COMMUNITY DEVELOPMENT

*COLLATERAL CHARACTERISTICS:*



*STRUCTURED FINANCE NOTES SCREEN*



# COME AS YOU ARE COMMUNITY DEVELOPMENT

*CLASSES/CUSIP/ =*



# COME AS YOU ARE COMMUNITY DEVELOPMENT

**PROSPECTUS FROM BLOOMBERG**
**This document is not available on the SEC web site.**

Prospectus Supplement
(To REMIC Prospectus dated August 1, 2007)

## $152,457,275



### Guaranteed REMIC Pass-Through Certificates
### Fannie Mae REMIC Trust 2008-91

**The Certificates**

We, the Federal National Mortgage Association (Fannie Mae), will issue the classes of certificates listed in the chart on this cover.

**Payments to Certificateholders**

We will make monthly payments on the certificates. You, the investor, will receive

* Interest accrued on the balance of your certificate (except in the case of the accrual classes), and
* principal to the extent available for payment on your class.

We will pay principal at rates that may vary from time to time. We may not pay principal to certain classes for long periods of time.

**The Fannie Mae Guaranty**

We will guarantee that required payments of principal and interest on the certificates are available for distribution to investors on time.

**The Trust and Its Assets**

The trust will own underlying RCR and REMIC certificates backed by Fannie Mae MBS or Fannie Mae Stripped MBS.

The mortgage loans underlying the Fannie Mae MBS and Fannie Mae Stripped MBS are first lien, single-family, fixed-rate loans.

| Class | Group | Original Class Balance | Principal Type(1) | Interest Rate | Interest Type(1) | CUSIP Number | Final Distribution Date |
|---|---|---|---|---|---|---|---|
| F | 1 | $121,840,000 | SC/TAC/AD | (2) | FLT | 31397M822 | March 2038 |
| SI | 1 | 121,840,000(3) | NTL | (2) | INV/IO | 31397M830 | March 2038 |
| Z | 1 | 10,969,879 | SC/SUP | 7.0% | FIX/Z | 31397M848 | March 2038 |
| XI | 2 | 36,597,391(3) | NTL | 5.5 | FIX/IO | 31397M855 | June 2037 |
| EA | 3 | 13,374,000 | SC/SEQ/AD | 6.0 | FIX | 31397M863 | July 2037 |
| EB | 3 | 2,082,000 | SC/SEQ/AD | 6.0 | FIX | 31397M871 | July 2037 |
| EC | 3 | 4,158,000 | SC/SEQ/AD | 6.0 | FIX | 31397M889 | July 2037 |
| EZ | 3 | 33,596 | SC/SEQ | 6.0 | FIX/Z | 31397M897 | July 2037 |
| R | | 0 | NPR | 0 | NPR | 31397MC21 | March 2038 |
| RL | | 0 | NPR | 0 | NPR | 31397MC39 | March 2038 |

(1) See "Description of the Certificates—Class Definitions and Abbreviations" in the REMIC prospectus.
(2) Based on LIBOR.
(3) Notional balances. These classes are interest only classes. See page S-7 for a description of how their notional balances are calculated.

The dealer will offer the certificates from time to time in negotiated transactions at varying prices. We expect the settlement date to be November 28, 2008.

Carefully consider the risk factors on page S-8 of this prospectus supplement and starting on page 10 of the REMIC prospectus. Unless you understand and are able to tolerate these risks, you should not invest in the certificates.

You should read the REMIC prospectus as well as this prospectus supplement.

The certificates, together with interest thereon, are not guaranteed by the United States and do not constitute a debt or obligation of the United States or any agency or instrumentality thereof other than Fannie Mae.

The certificates are exempt from registration under the Securities Act of 1933 and are "exempted securities" under the Securities Exchange Act of 1934.

**JPMorgan**
November 21, 2008

# COME AS YOU ARE COMMUNITY DEVELOPMENT

## <u>SUMMARY OF PROSPECTUS</u>

### SUMMARY

This summary contains only limited information about the certificates. Statistical information in this summary is provided as of November 1, 2008. You should purchase the certificates only after reading this prospectus supplement and each of the additional disclosure documents listed on page S-3. In particular, please see the discussion of risk factors that appears in each of those additional disclosure documents.

**Assets Underlying Each Group of Classes**

| Group | Assets |
|-------|--------|
| 1 | Class 2008-17-NF RCR Certificate |
|   | Class 2008-17-NS RCR Certificate |
| 2 | Class 2007-50-GF REMIC Certificate |
|   | Class 2007-50-SG REMIC Certificate |
| 3 | Class 2007-63-BA REMIC Certificate |

**Group 1, Group 2 and Group 3**

Exhibit A describes the underlying RCR and REMIC certificates in Group 1, Group 2 and Group 3, including certain information about the related mortgage loans. To learn more about the underlying RCR and REMIC certificates, you should obtain from us the current class factors and the related disclosure documents as described on page S-3.

**Settlement Date**

We expect to issue the certificates on November 28, 2008.

**Distribution Dates**

We will make payments on the certificates on the 25th day of each calendar month, or on the next business day if the 25th day is not a business day.

**Record Date**

On each distribution date, we will make each monthly payment on the certificates to holders of record on the last day of the preceding month.

**Book-Entry and Physical Certificates**

We will issue the classes of certificates in the following forms:

| Fed Book-Entry | Physical |
|----------------|----------|
| All classes of certificates other than the R and RL Classes | R and RL Classes |

S-6

# COME AS YOU ARE COMMUNITY DEVELOPMENT

## THE CORRECT PROCESS OF SECURITIZATION

PARTY A
ORIGINATOR/LENDER

FIRST HOUSTON
MORTGAGE, LTD.

PARTY B
SPONSOR/SELLER

FANNIE MAE / JPMORGAN

**TRUE SALE**
1) LEGAL OPINIONS
2) ASSET PURCHASE / SALE AGREEMENTS
3) DELIVERY & ACCEPTANCE RECEIPTS
4) COMPENSATION / MONEY
5) CAPACITY OF PARTIES TO BUY AND SELL

PARTY C
DEPOSITOR

N/A

## HOW LENDERS "SIDE-STEPPED" THE PROCESS

PARTY A
LENDER

FIRST HOUSTON
MORTGAGE, LTD.

PARTY B
SPONSOR/SELLER

FANNIE MAE / JPMORGAN

**TRUE SALE**
1) LEGAL OPINIONS
2) ASSET PURCHASE / SALE AGREEMENTS
3) DELIVERY & ACCEPTANCE RECEIPTS
4) COMPENSATION / MONEY
5) CAPACITY OF PARTIES TO BUY AND SELL

PARTY C
DEPOSITOR

N/A



**DEFINITIONS:**

**Beneficiary:** A beneficiary (also, in trust law, *cestui que use*) in the broadest sense is a natural person or other legal entity who receives money or other benefits from a benefactor. The beneficiaries of a trust are the persons with equitable ownership of the trust assets, although legal title is held by the trustee.

**Custodian:** The Custodian is often the same entity as the Trustee, and is typically engaged to hold onto the funds in cash reserves serving as internal credit enhancements of the securitization and collateral security documents related to the transferred assets.

**Debtor:** The Debtor is the person who borrows money from the Lender.

**Depositor:** The Depositor is the entity who buys the loans from the Sponsor and deposits them with the Issuing Entity.

**Issuing Entity:** The Issuing Entity is a statutory trust and the intermediary owner of the loan documents. The issuing entity also issues securities that represent undivided interests in the cash flows from a particular pool of loans.

**Investor:** An investor is a party that makes an investment into one or more categories of assets, such as equity, debt securities, real estate, currency, commodity, derivatives such as put and call options, etc. with the objective of making a profit.

**Lender:** The Lender is the Originator of the loan for the Debtor. In some instances the Lender and the Originator are the same entities, in others, the role of the Originator is to buy and accumulate loans from different lenders. In the latter, the Originator is also called a Wholesale Lender.

**Servicer:** The Servicer is the entity who collects monthly payments from borrowers and passes the cash flows to the Trustee. The Servicer must advance to the Trust payments due from delinquent borrowers before collection.

**Sponsor:** The Sponsor is the entity who buys the loans from different Originators, combines them into a pool, and sells them to the Depositor.

**Trustee:** The Trustee acts on behalf of the Trust and the investors. It is essentially an administrative function, to represent the Trust, to monitor the effectiveness of the servicing, to manage and oversee the payments to the certificate holders, and to administer any reserve accounts.

**Underwriter:** The Underwriter is the Wall Street investment firm who provides initial capital to purchase the securities. As the initial purchaser, the Underwriter plays a key role in structuring the entire transaction, including a role in determining the characteristics of the underlying loans.



**Certified Forensic Loan Auditors**


CASE LAW

EMERALD GARDENS CONDOMINUM, APPELLANT V. US BANK, RESPONDENT

Download Link

**Opinion Information Sheet: DO NOT CITE. SEE RAP GR 14.1(a).**

**Washington Appellate Court Reverses and Directs Trial Court Ruling to reinstate the order of default and decree Quieting Title**

In this case, the homeowner gave up their rights to the property, turning it over to the Homeowner's Association, who in turn sued the bank for Quiet Title. The Homeowner's Association won by default.

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR GREENSPOINT FUNDING, APPELLANT V. NANCY GROVES, APPELLEE, APRIL 12, 2011

Download Link

**Colorado Appellate Court Upholds Trial Court Ruling to Quiet Title**

Excerpts

"**Memorandum Opinion**"

"Nancy Groves sued Mortgage Electronic Registration Systems, Inc. (MERS), as nominee for Greenspoint Funding, to invalidate a deed of trust securing MERS's alleged lien on Groves's property. The trial court entered a default judgment against MERS, which then filed this restricted appeal. We affirm."

"The trial court's judgment states:

"[T]he court Orders and Adjudges, that [Groves] is the owner of [the property].

"The court further Orders and Adjudges that the Deed of Trust filed is void and has no force or effect.

"The court further orders the deed of trust removed from the title to the property made the subject of this litigation."

RANG JIN HWANG NO. LA08-15337SB. UNITED STATES BANKRUPTCY COURT, C.D. CA. SEPTEMBER 4, 2008.

Download Link

COPYRIGHT 2012 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2012
-All Rights Reserved-



**Certified Forensic Loan Auditors**

"**Opinion Denying Lift Stay for Failure to Join Real Part in Interest**"

**Excerpts from the Conclusion:**

"Consequently, if a loan servicer wishes to seek relief from the automatic stay, either as agent or nominee of the noteholder, the servicer may do so only if the noteholder either joins or ratifies the motion. Absent joinder or ratification, the noteholder must substitute into the servicer's place, and prosecute the motion on its own. Fed.R.Civ.P. 17(a)(3).

If the servicer has mistakenly failed to seek relief in the noteholder's name, the court must allow a reasonable time for the noteholder to join or substitute into the action. Id. IndyMac, by its own admission, is not the holder of the note on which this motion is based, and therefore lacks the authority to enforce the note. Since it lacks the authority to enforce the note, IndyMac also has no authority whatsoever to enforce the mortgage on Rang Jin Hwang's Las Vegas residence."

396 B.R. 511 (2008) RAYMOND VARGAS NO. LA08-17036SB. UNITED STATES BANKRUPTCY COURT, CD. CA. OCTOBER 21, 2008.

Download Link

**Mers Relief from Stay Motion: Findings of Fact and Conclusion of Law**

**Excerpts from the Conclusion:**

"The court concludes that this motion for relief from stay must be denied on two separate grounds. First, the motion improperly *522 attempts to obtain relief for unidentified parties, in violation of the rule requiring the disclosure of parties appearing before the court. Second, the only evidence supporting the motion is provided by a witness who is incompetent to provide any relevant evidence"

U.S. BANK NATIONAL ASSOCIATION, TRUSTEE [FN1] VS. ANTONIO IBANEZ NO. SJC-10694. SUPREME JUDICIAL COURT, MA JANUARY 7, 2011

Download Link

**US National Bank is Denied Quiet Title**

**Excerpts**

"After foreclosing on two properties and purchasing the properties back at the foreclosure sales, U.S. Bank National Association (U.S.Bank), as trustee for the Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2006-Z; and Wells Fargo Bank, N.A. (Wells Fargo), as trustee for ABFC 2005-OPT 1 Trust, ABFC Asset Backed Certificates, Series 2005-OPT 1 (plaintiffs) filed separate complaints in the Land Court asking a judge to declare that they held clear title to the properties in fee simple. We agree with the judge

Page | 13

*COPYRIGHT 2012 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2012*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

that the plaintiffs, who were not the original mortgagees, failed to make the required show-
ing that they were the holders of the mortgages at the time of foreclosure. As a result, they
did not demonstrate that the foreclosure sales were valid to convey title to the subject
properties, and their requests for a declaration of clear title were properly denied."

## CHRISTINE PROVOST VS. DIVERSIFIED FINANCIAL, ETC. NO. 09-3-25191-6 SEA SUPERIOR COURT OF WASHINGTON IN AND FOR THE COUNTY OF KING

### Download Link

**Judgment & Findings for Damages and Quiet Title**

Findings state that the defendants had "unclean hands" as outlined in the declarations filed by Plain-
tiff and also did not act with diligence.  Monetary damages as well as quiet title are given to plaintiff.

## LANDMARK NATIONAL BANK, PLAINTIFF/APPELLEE, V. BOYD A. KESLER NO. 98,489 SUPREME COURT, KS SEPTEMBER 29 2008

### Download Link

**MERS Lacks the Power to Foreclose**

### Excerpts

"The legal status of a nominee, then, depends on the context of the relationship of the
nominee to its principal. Various courts have interpreted the relationship of MERS and the
lender as an agency relationship. See In re Sheridan, ___ B.R. ___, 2009 WL 631355, at *4
(Bankr. D. Idaho March 12, 2009) (MERS "acts not on its own account. Its capacity is repre-
sentative."); Mortgage Elec. Registration System, Inc. v. Southwest, ___ Ark. ___, ___, ___
S.W.3d ___, 2009 WL 723182 (March 19, 2009) ("MERS, by the terms of the deed of trust,
and its own stated purposes, was the lender's agent"); LaSalle Bank Nat. Ass'n v. Lamy, 2006
WL 2251721, at *2 (N.Y. Sup. 2006) (unpublished opinion) ("A nominee of the owner of a
note and mortgage may not effectively assign the note and mortgage to another for want of
an ownership interest in said note and mortgage by the nominee.")

The relationship that MERS has to Sovereign is more akin to that of a straw man than to a party pos-
sessing all the rights given a buyer. A mortgagee and a lender have intertwined rights that defy a
clear separation of interests, especially when such a purported separation relies on ambiguous con-
tractual language. The law generally understands that a mortgagee is not distinct from a lender: a
mortgagee is "[o]ne to whom property is mortgaged: the mortgage creditor, or lender." Black's Law
Dictionary 1034 (8th ed. 2004). By statute, assignment of the mortgage carries with it the assign-
ment of the debt. K.S.A. 58-2323. Although MERS asserts that, under some situations, the mortgage
document purports to give it the same rights as the lender, the document consistently refers only to
rights of the lender, including rights to receive notice of litigation, to collect payments, and to en-

*COPYRIGHT 2012 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2012*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

force the debt obligation. The document consistently limits MERS to acting "solely" as the nominee of the lender.

Indeed, in the event that a mortgage loan somehow separates interests of the note and the deed of trust, with the deed of trust lying with some independent entity, the mortgage may become unenforceable.

"The practical effect of splitting the deed of trust from the promissory note is to make it impossible for the holder of the note to foreclose, unless the holder of the deed of trust is the agent of the holder of the note.

[Citation omitted.] Without the agency relationship, the person holding only the note lacks the power to foreclose in the event of default. The person holding only the deed of trust will never experience default because only the holder of the note is entitled to payment of the underlying obligation. [Citation omitted.]

The mortgage loan becomes ineffectual when the note holder did not also hold the deed of trust." Bellistri v. Ocwen Loan Servicing, LLC, 284 S.W.3d 619, 623 (Mo. App. 2009).

JOSHUA & STEPHANIE MITCHELL CASE NO. BK-S-07-16226-LBR, CHAPTER 7 UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA MARCH 31, 2009

**Download Link**

**MERS Does Not Have Legal Standing**

**Excerpts from Summary**

> **OVERVIEW:** The organization claimed that it had the right to seek relief from the stay that was imposed when the debtors declared bankruptcy because it was named as a beneficiary under deeds of trust the debtors executed, or because it was another beneficiary's nominee. The court disagreed. The organization did not have standing merely because it was the alleged beneficiary under a deed of trust, and terms and conditions which governed the organization's operations showed that it was not a beneficiary because it did not have the right to receive payments, any servicing rights, or rights to property that secured debtors' loans. In order to enforce rights as the agent of a holder, the organization had to show that its principal was entitled to enforce the note. Counsel for the organization acknowledged that the organization was the agent for its members only, and if a note was transferred to a nonmember, the organization could not act as the agent. The court could not assume that just because the organization was named as the initial nominee in a deed of trust that it still retained that relationship with the holder of the note.

> **OUTCOME:** The court found that the organization did not have standing to seek an order lifting the stay in two cases it considered with the debtors' case, and it denied the organization's motion to lift the stay in those cases

*COPYRIGHT 2012 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2012*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

**STATE OF CALIFORNIA**                    )
                                           ) sv.: AFFIDAVIT
**COUNTY OF ORANGE**                       )

I, Michael Carrigan, with personal knowledge of matters set forth herein, one of the people in California, in correct public capacity, being of majority in age, competent to testify with clean hands declares and verifies that the facts stated herein are true, correct, and complete in all material facts, not misrepresented and made under the penalties of perjury of the laws of the United States of America and California, except as to those matters that are therein made upon information and belief, and as to those claims or facts, the undersigned believes them to be true and admissible as evidence in a court of law and if called upon as a witness, I will testify to the veracity of my statements:

> I, Michael Carrigan, have researched Bloomberg's Professional Service. I am authorized to use such service. I have the requisite knowledge and the trained ability to navigate and perform effective searches on the Bloomberg Terminal.

> I am also a certified Mortgage Securitization Auditor and I have the requisite knowledge and the trained ability to navigate and perform searches on the Bloomberg Terminal as well as the Securities Exchange Commission (SEC), Fannie Mae, Freddie Mac and Mortgage Electronic registration Systems (MERS) sites regarding the analysis of Mortgage loans and the subsequent loan-related documents.

> The contents of this affidavit are factual, but it is provided for informational purposes only and is not to be construed as "legal advice."

> I am available for court appearances, in person or via phone, for further clarification or explanation of the information provide herein, if necessary.

By

Michael Carrigan

MSA/Bloomberg Professional Researcher

*COPYRIGHT 2012 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2012*
*All Rights Reserved*

Page | 16



**Certified Forensic Loan Auditors**

COPYRIGHT 2012 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2012
-All Rights Reserved-



**Certified Forensic Loan Auditors**

**STATE OF CALIFORNIA** )
) sv.: ACKNOWLEDGEMENT
**COUNTY OF ORANGE** )

On June ____, 2012 before me,_____

(Notary Public)

personally appeared **Michael Carrigan**, who proved to me on the basis of satisfactory evidence to be the man whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument under the penalty of perjury.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

My commission Expires _____

COPYRIGHT 2012 CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2012
-All Rights Reserved-